# Supreme Court of Texas

### No. 20-0737

United Rentals North America, Inc.,

*Petitioner*,

v.

Pamela Evans, Individually and as Administrator for the Estate of Clark Brandon Davis, and Dominic Jones,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued November 30, 2022**

JUSTICE BLACKLOCK delivered the opinion of the Court.

JUSTICE LEHRMANN did not participate in the decision.

Clark Davis died in a terrible traffic accident on Interstate 35 near Salado. As Davis approached an overpass, a large piece of equipment carried on a flatbed trailer struck the overpass. The falling debris crushed Davis's vehicle, and he died quickly. His estate, his mother, and his son brought wrongful death and survival claims against

several defendants. The case proceeded to trial against one defendant, United Rentals.

During jury selection, counsel for the plaintiffs stated that "the African-American female is the most favorable juror for this case." This announced preference was consistent with the plaintiffs' peremptory strikes of four white men and one Hispanic man. After a verdict for the plaintiffs, the district court rendered a substantial money judgment, which the court of appeals affirmed.

We hold that a new trial is required. Most *Batson* claims ask courts to engage in the speculative enterprise of inferring race-based motivations from a record that is facially race neutral. This is the rare case in which the record contains an admission of counsel's preference for jurors of a certain race. We last encountered such a record in *Powers v. Palacios*, in which counsel admitted that a juror's race "figured into" the decision to strike her. 813 S.W.2d 489, 490 n.1 (Tex. 1991). We summarily ordered a new trial in that case, and we do the same today.

In so doing, we do not impugn the integrity of the counsel involved in this case, who no doubt relied on conventional sources of insight into jury-selection strategy, such as the advice of jury consultants or feedback from focus groups. But consulting these sources for advice on the *color* of an ideal juror cannot help but undermine our judicial system's obligation to provide race-neutral proceedings. This Court's precedent insists that jury selection—which routinely involves venire panels as diverse as the population of Texas—must be conducted without regard to race, to the greatest extent possible. The expression on the record of a race-based preference, coupled with peremptory

2

strikes consistent with the stated preference, compels the conclusion that racial considerations impermissibly tainted the selection of this jury. The district court could have remedied this problem prior to trial, but it did not, so a new trial is required.

In addition to resolving the jury-selection issue, we also hold that United Rentals is not entitled to rendition of judgment on its argument that it owed no common law tort duty to the plaintiffs. United Rentals is entitled, however, to rendition of judgment on Davis's survival claim. The plaintiffs sought only pain-and-suffering damages for this claim, and there was no evidence at trial that would allow a reasonable juror to find that Davis suffered any such damages in the fleeting moments between the onset of the accident and his sudden passing. The case is remanded for a new trial on the plaintiffs' remaining claims.

## I.

### A.

United Rentals North America, Inc., is a nationwide equipment rental company with over one hundred branch locations throughout Texas. In March 2015, United Rentals decided to transport two large pieces of its equipment from a San Antonio branch to an Irving branch. One was a forklift with an attachment called a "boom arm." The second was a "Genie S-125 boom lift." The forklift was eight feet, three inches tall. It was considered an ordinary load that could be transported on an ordinary flatbed trailer. The Genie S-125 boom lift was ten feet, one inch tall. At this height, combined with the height of an ordinary flatbed trailer, the boom lift was considered oversized and therefore required a

3

special permit from the Texas Department of Motor Vehicles.[1]  Such a permit would have specified a suitable route for safe passage.  No permit was obtained to transport the boom lift.  United Rentals' own "Transportation Guide" showed a maximum load height of eight feet, six inches for an ordinary flatbed trailer.  Safely transporting the boom lift required a special trailer with a lower deck.

Lares Trucking was hired to transport the forklift, and a company called "Truckin By the Wild West" was hired to transport the oversized load, the boom lift.  Both loads were scheduled for transport on March 26, 2015.  Lares driver Valentin Martinez arrived on the morning of March 26th with a conventional flatbed trailer.  He met with Manuel Montez, a United Rentals operations manager.  Martinez, speaking broken English, said he was there for a "boom."  Montez, who is bilingual, asked Martinez to provide a bill of lading (BOL) number, but Martinez did not have one.  United Rentals requires a BOL before equipment is released because it helps ensure the equipment is transported by the correct carrier.  Montez knew he needed to verify that the BOL number provided by Martinez matched the BOL number assigned to the equipment being transported, but he failed to do so.  Martinez tried unsuccessfully to contact his supervisor to obtain a BOL number.

Montez then called Julie Gainor, a United Rentals regional manager.  He told Gainor that a driver was at the San Antonio branch to pick up a "boom" but did not have a BOL number.  There was evidence

---

[1] *See* TEX. TRANSP. CODE § 621.207; 43 TEX. ADMIN. CODE §§ 219.2(b)(43), .2(b)(46), .10.

4

that "boom" could refer to a forklift with a boom arm as well as a boom lift. Gainor found the BOL number for the Genie S-125 boom lift and sent it to Montez. Montez then gave the BOL number for the boom lift to another United Rentals employee, Nick Watts. Watts drove the boom lift onto Martinez's flatbed trailer. No one measured the height of the load at the time, but the evidence indicates that it measured fourteen feet, seven inches tall. Gainor testified that had she known Martinez brought a normal flatbed trailer to haul an S-125 boom lift, she would have been concerned "because you can't haul a 125 on a flatbed." However, the BOL that Gainor sent to Montez specified that the Genie S-125 boom lift was being transported by "Trailer Type: FLATBED."

Before departing, Martinez returned to the United Rentals office and showed Montez his cell phone with the BOL number for the forklift. This number did not match the BOL number for the boom lift that had already been loaded onto Martinez's truck, but Montez failed to notice the discrepancy. Martinez signed the BOL for the boom lift. Company policy required Montez to also sign the BOL, but he did not. Martinez departed for Irving between 9:00 a.m. and 9:30 a.m.

Specialized trailers are needed to transport oversized loads like the boom lift. Martinez did not have such a trailer, but around 10:45 a.m., Bob West, an experienced truck driver, arrived with a "step-deck" trailer to pick up the boom lift. A step-deck trailer sits about two feet lower than a regular flatbed trailer. West showed Montez the BOL for the boom lift, but Montez told him the equipment had already left with another driver. Montez contacted Gainor. She realized Martinez had picked up the wrong load. No one with United Rentals

5

contacted anyone about the mistake. West was given the forklift to transport. West testified that United Rentals should not have loaded the boom lift onto an ordinary flatbed trailer. United Rentals' regional fleet director likewise testified that Martinez had been given "the wrong piece of equipment" and that the boom lift should have been transported by a different driver using a lower trailer.

Around 11:15 a.m., Martinez approached a construction zone in Salado as he headed north on Interstate 35. Multiple signs warned that the bridge under construction was low and that loads over thirteen feet, six inches should exit before the overpass. Martinez did not exit. His truck's cargo struck the overpass. Two massive beams collapsed onto the highway. Meanwhile, Clark Davis was driving south on the highway in his pickup truck. One of the beams struck the hood of his truck and crushed it. Davis suffered catastrophic injures and died at the scene. The beam fell so quickly that Davis had no time to react by hitting his brakes or swerving.

The Texas Department of Public Safety investigated the crash. Its report concluded that the crash was caused by the truck driver's error, noting as contributing factors the oversized load, the truck driver's lack of attention to the roadway, and the truck driver's disregard for posted warning signs in the construction zone. The report also concluded that "the incorrect piece of equipment was loaded. Had the correct piece of equipment been loaded, the crash would not have occurred. This does not relieve the driver of the responsibility to check the height of his load and if needed, obtain a permit."

**B.**

Davis's mother, Pamela Evans, and Davis's son, Dominic Jones, filed a survival claim on behalf of Davis's estate and a wrongful death action on behalf of themselves. They sued several defendants, including United Rentals, Lares Trucking, and Martinez. All defendants except United Rentals settled or were dismissed before judgment.[2]

Exercising its discretion to equalize peremptory strikes in a case involving multiple parties, *see* TEX. R. CIV. P. 233, the district court gave the defense nine peremptory strikes and the plaintiffs six, resulting in a "strike zone" of twenty-seven potential jurors.[3] The plaintiffs exercised five of their six allotted strikes. They struck four white males and one Hispanic male. United Rentals struck five black females, two white females, and two white males. Both sides challenged the opposing side's strikes as improperly motivated. The district court sustained the plaintiffs' challenge as to two black females struck by the defense. Both ended up on the twelve-person jury. The court denied the defense's challenge to the plaintiffs' strikes. The jury selected included four black women, one Asian woman, two Hispanic women, five Hispanic men, and no white jurors.

---

[2] The defendants also included U.S. Logistics—a broker that hired Lares Trucking—and other entities involved in the construction of the bridge.

[3] By "strike zone" we mean "the group of potential jurors capable of being on the jury." *Comeaux v. State*, 445 S.W.3d 745, 751 (Tex. Crim. App. 2014). These twenty-seven potential jurors consisted of one Asian female, three Hispanic females, eight black females, three white females, six Hispanic males, and six white males.

7

The jury charge asked whether the negligence of any of four potentially responsible parties proximately caused the injury and asked the jury to fix a percentage of responsibility as to each contributing party.[4] The jury assigned 30% responsibility to United Rentals. It awarded a total of $1.6 million to Jones, $2.7 million to Evans, and $5 million to Davis's estate for his physical pain and mental anguish prior to death. Consistent with the jury's proportioning of responsibility, the court rendered judgment of $810,000 to Evans, $480,000 to Jones, and $1.5 million to the estate, plus pre-judgment and post-judgment interest.

United Rentals appealed. The court of appeals affirmed the district court's judgment. 608 S.W.3d 449, 485 (Tex. App.—Dallas 2020). Three justices, in two writings, dissented from denial of en banc review.[5]

## II.

We begin with the jury-selection issue.[6] United Rentals first complains that the district court erred by granting the plaintiffs'

---

[4] The four potentially responsible parties listed in the charge were "James Construction Group," "United Rentals North America," "Lares Trucking/Valentin Martinez," and "HNTB Corporation."

[5] Justice Evans, joined by Justices Whitehill and Schenck, favored en banc reconsideration of the jury-selection issue. Justice Schenck, joined by Justice Whitehill, would have granted en banc reconsideration of the amount of damages for Davis's pain and suffering. 608 S.W.3d at 485, 505.

[6] In addition to seeking a new trial on this basis, United Rentals also seeks rendition of judgment in its favor, on the theory that it owed no tort duty to the plaintiffs. If that argument were correct, we would not reach the request for a new trial based on jury-selection error. As explained in Part III, however,

8

challenge to two of its peremptory strikes. Because a new trial is required for other reasons, we do not reach this issue. As explained below, we agree with United Rentals that a new trial is required by our precedent because one party stated a preference for black jurors, that party exercised its strikes in concert with the stated preference, and the court did not remedy the situation before trial.[7]

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the U.S. Supreme Court held "that a criminal defendant is denied equal protection under the United States Constitution if a prosecutor uses peremptory challenges to exclude members of the jury panel solely on the basis that their race is the same as the defendant's." *Goode*, 943 S.W.2d at 444. Five years later, in *Edmonson v. Leesville Concrete Co.*, the U.S. Supreme Court decided that "race-based exclusion" of civil jurors violates the equal protection rights of the excluded juror. 500 U.S. at 616. That same year, in *Powers v. Palacios*, this Court followed

United Rentals is not entitled to rendition of judgment on all claims against it, so we address its request for a new trial.

[7] While both parties complain that the other party improperly exercised peremptory challenges on the basis of both race and sex, we confine our discussion to race. This Court has on multiple occasions recognized that when there is proof that prospective jurors were struck on account of race and the trial court does not remedy the matter, reversal is required in civil cases. *See, e.g.*, *Powers*, 813 S.W.2d at 490 (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991)); *Goode v. Shoukfeh*, 943 S.W.2d 441, 444 (Tex. 1997); *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 526 (Tex. 2008). We have not had occasion to address an allegation of a peremptory strike based on a juror's sex, although the U.S. Supreme Court, in a criminal case, has said that sex discrimination in jury selection is prohibited. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). Because separate analysis of the sex-discrimination aspect of the parties' arguments would not affect the outcome here, we need not address it.

*Edmonson*, extending restrictions on "the unconstitutional use of peremptory challenges in criminal actions to civil litigation." 813 S.W.2d at 491. We have twice had occasion since *Powers* to consider allegations that peremptory strikes were improperly based on race. *See Goode*, 943 S.W.2d at 444; *Davis*, 268 S.W.3d at 510–11.

As exemplified by our decisions in *Goode v. Shoukfeh* and *Davis v. Fisk Elec. Co.*, courts across the country faced with what is commonly called a "*Batson* claim" usually conduct a three-step analysis to determine whether the challenged strikes were purposefully discriminatory. *See, e.g.*, *Goode*, 943 S.W.2d at 445–46; *Davis*, 268 S.W.3d at 514 n.4; *Hernandez v. New York*, 500 U.S. 352, 358–59 (1991). First, "the opponent of the peremptory challenge must establish a prima facie case of racial discrimination." *Goode*, 943 S.W.2d at 445. Because an on-the-record statement of racial preference is exceedingly rare, the first step usually entails statistical analysis or suggestions of unspoken motive designed to generate an "inference" of discrimination.[8] With the inference generated, the burden at the second step "shifts to the party who has exercised the strike to come forward with a race-neutral explanation." *Goode*, 943 S.W.2d at 445. Finally, "at the third step of the process, the trial court must determine if the party challenging the strike has proven purposeful racial discrimination." *Id.*

---

[8] *See, e.g.*, *Batson*, 476 U.S. at 93–94 (describing steps for showing "an inference of discriminatory purpose"); *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 155–56 (Tex. 1995) ("[I]t is clear that the initial inference that the plaintiffs used their peremptory strikes improperly was tenable."); *Salazar v. State*, 795 S.W.2d 187, 191 (Tex. Crim. App. 1990) ("The court of appeals held that appellant failed to meet the three *Batson* criteria for raising an inference of purposeful discrimination.").

10

In *Powers v. Palacios*, we confronted the exceptional situation in which counsel admitted on the record that race "figured into" the decision to strike a black prospective juror, although counsel denied that race affected the decision "improperly" and maintained that race "was not the sole reason for striking her." 813 S.W.2d at 490 n.1. We did not engage in the three-step analysis common to ordinary *Batson* cases. Instead, we summarily reversed the judgment below and remanded for a new trial because the admission, on its own, "established that opposing counsel had exercised a peremptory challenge discriminatorily." *Id.* at 491. The express holding of *Powers* is "that equal protection is denied when race is a factor in counsel's exercise of a peremptory challenge to a prospective juror." *Id.*

*Powers*' statement that a violation occurs when race is "a factor" in a peremptory strike is in some tension with the standard articulated in *Batson* itself—that the Constitution is violated when prospective jurors are struck "solely on account of" race. *Batson*, 476 U.S. at 89. Because of this inconsistency, some courts interpreted *Powers*' statement that race need only be "a factor" in the strike as a Texas-specific relaxation of the U.S. Supreme Court's standards for discerning impermissible motive in jury selection. *See*, *e.g.*, *Benavides v. Am. Chrome & Chems., Inc.*, 893 S.W.2d 624, 626 (Tex. App.—Corpus Christi–Edinburg 1994, writ denied with opinion) (holding that "[w]e and the Texas Supreme Court have gone a step further than some other jurisdictions"). We quickly disclaimed any such relaxation, however. *Am. Chrome & Chems., Inc., v. Benavides*, 907 S.W.2d 516, 517 (Tex. 1995) (repudiating the court of appeals' statement that "the Texas

11

Supreme Court [had] gone a step further"); *Goode*, 943 S.W.2d at 445 (disagreeing that *Powers* relaxed the analysis and describing the appropriate inquiry as to whether the strike was "on the basis of race"). Later, in *Davis*, we characterized the ultimate goal of the three-step inquiry as determining whether race "explains" the strike "better than any other reason."[9] 268 S.W.3d at 526.

*Powers v. Palacios* is thus an outlier case in multiple respects. It does not engage in the three-step inquiry envisioned by *Batson* and later cases, instead summarily remanding for a new trial due to the trial court's failure to remedy counsel's admission of a race-based motive in jury selection. *Powers* is also an outlier in holding that race need only be "a factor" motivating the peremptory strike. *Powers* remains this Court's precedent, but given intervening developments in the law, its apparently broad holding is best understood as limited to the rare circumstance in which an admission of racial preference in jury selection appears explicitly in the record. Therefore, *Powers*' statement that a *Batson* violation occurs when race is "a factor" in striking a juror does not control in the typical *Batson* case when courts are asked to discern counsel's motivations from a mixture of imputed and proffered explanations. But unless *Powers* is overruled, which no party requests, the case continues to stand for the limited proposition that admission on the record of race-based motivation in jury selection "establishe[s] that

---

[9] The U.S. Supreme Court has since described the three-step inquiry as designed to determine whether the peremptory strike was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2245 (2019).

[] counsel ha[s] exercised a peremptory challenge discriminatorily." 813 S.W.2d at 491.

The case before us is the unusual one, similar to *Powers*, in which an explicit preference for jurors of a certain race (and therefore against jurors of other races) was plainly stated on the record. During a lengthy discussion of the parties' competing *Batson* challenges, counsel for the plaintiffs offered the following as a reason to believe that the defendant used a strike on a black female because of her race: "We know from our focus groups that the African-American female is the most favorable juror for this case for whatever reason."[10]

Faced with such a statement, our precedent in *Powers* indicates that we need not proceed, as many cases do, with a lengthy analysis of the three-step *Batson* framework and how it applies to particular strikes. Courts asked to impute impermissible racial motive based on inferences from a race-neutral record should never do so lightly. Any attempt to divine another person's unspoken motives, particularly from a cold record, is fraught with uncertainty. We should strive throughout the law for easily administrable bright-line rules, which can be followed by parties with confidence and applied by judges with predictability. *See, e.g.*, *Gutierrez v. Collins*, 583 S.W.2d 312, 317 (Tex. 1979) (favoring standards that "provide[] a uniform, consistent, and predictable rule of

---

[10] According to Justice Evans' dissenting opinion urging en banc review: "This particular civil case appears to be the first in the United States where a race- and gender-based *goal*—the substantial motivation—in selecting the jury was plainly and openly stated, and 100% of the peremptory challenges were perfectly consistent with that stated goal." 608 S.W.3d at 486 (Evans, J., dissenting). We are not directed to, and have not identified, any other such case.

law, thus simplifying the task of both lawyers and the courts"). Most *Batson* claims, by their very nature, deal in subjective implications and inferences rather than objective bright-line rules. The potential for judicial mistake is high, and courts should approach this unwelcome but required task with humility. But in the rare case where the record contains a clear admission of racial preference in jury selection, *Powers* provides an easily administrable bright-line rule, which we apply today.

Of course, it is not the mere expression of a racial preference in jury selection, standing alone, that requires reversal. It is instead the actual strike of a juror on account of race. Thus, even when a racial preference is announced, if the peremptory strikes are not consistent with the announced preference, there will be no grounds to find the strikes unlawful. Here, the strikes are consistent with the announced preference. Plaintiffs' counsel struck four white males and one Hispanic male. As a dissenting court of appeals justice observed, counsel's goal "in selecting the jury was plainly and openly stated, and 100% of the peremptory challenges were perfectly consistent with that stated goal." 608 S.W.3d at 486 (Evans, J., dissenting).

The plaintiffs object that they only used five of their six allotted strikes. They do not explain why they did not use the last strike. Regardless, we fail to see why this fact alters the analysis. All the strikes that *were* used were consistent with the stated racial preference, and the decision not to use the final strike does not undercut the clearly stated and demonstrated racial preference.

The plaintiffs also emphasize that counsel's comment regarding "the most favorable juror" was made during a discussion of the plaintiffs'

14

challenge to the defense's strikes, not a discussion of the plaintiffs' strikes. The plaintiffs argue that the comment was made to demonstrate the pretextual nature of the defense's race-neutral explanation for its strike of a black female. This argument is unpersuasive. There is no getting around the statement's clear expression of a racial preference in jury selection, and the statement was made during a lengthy exchange among counsel and the court regarding both sides' *Batson* challenges.

Even if the statement is viewed purely as an attempt to explain the defense's motives, the statement suggests that counsel for the plaintiffs accused defense counsel of improperly striking black females at least in part to advance his own preference for jurors of one race over jurors of other races. If counsel for both sides "knows" based on focus groups or jury consultants that jurors of a certain race are "good" or "bad" for one side or the other, then the improper use of racially motivated peremptory strikes is not the only concern. *Batson* challenges themselves can also be used in an improper attempt to influence the racial composition of the jury in what the challenger perceives to be his favor. A race-conscious jury-selection strategy thus poisons the entire enterprise—from voir dire to peremptory strikes to arguments about *Batson*.

"It is a sordid business, this divvying us up by race." *LULAC v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part). Judges bear the ultimate responsibility for administering race-neutral proceedings, but if our system of justice is ever to rid itself entirely of

racial discrimination, lawyers and jury consultants must do their part as well.[11]

Because counsel stated a racial preference in jury selection, the peremptory strikes were consistent with that preference, and the district court did not remedy the matter, a new trial is required.[12]

## III.

## A.

United Rentals argues that judgment should be rendered in its favor because it had no duty under Texas law that would support the plaintiffs' negligence claims. If that is correct, then we need not reach any other issues, including the jury-selection issue discussed above. It is not correct, however, for the reasons explained below.

The existence of a legal duty owed by the defendant to the plaintiff is an essential element of a negligence claim. *D. Houston, Inc., v. Love,*

---

[11] The record of the voir dire and the plaintiffs' briefing in this Court make clear that the plaintiffs employed jury consultants.

[12] Trial courts have extensive leeway in fashioning appropriate remedies for improper racial considerations in jury selection. *See United States v. Bartee*, 301 F. App'x 46, 48 (2d Cir. 2008) ("A district court's discretion to fashion remedies for *Batson* violations is broad."); *Price v. Short*, 931 S.W.2d 677, 681 (Tex. App.—Dallas 1996, no writ) ("If the trial court determines that the prosecution used peremptory strikes in a racially discriminatory manner, the court may dismiss the array and summon a new one . . . or it 'may fashion a remedy in its discretion consistent with *Batson* and its progeny.'") (quoting *State ex rel. Curry v. Bowman*, 885 S.W.2d 421, 425 (Tex. Crim. App. 1993)); *Garza v. State*, 10 S.W.3d 765, 768 (Tex. App.—Corpus Christi–Edinburg 2000, pet. ref'd.) (After the use of peremptory strikes, there were no women on the jury and six of the ten strikes used by the defense were against women, so the trial court used its discretion to disallow all six strikes of women and permit the defendant to re-exercise its strikes.). Statements such as the one made here need not irretrievably taint the proceedings, so long as they are remedied by the district court prior to trial.

92 S.W.3d 450, 454 (Tex. 2002). Although a duty's existence can depend on the facts of the case, whether a duty exists under a given set of facts is always a question of law for the court. *Three Aces Towing, Inc. v. Landrum*, 653 S.W.3d 727, 729–30 (Tex. 2022). We agree with the plaintiffs and the court of appeals that United Rentals owed the plaintiffs an actionable duty under these circumstances.

As we have previously observed:

> There are many instances in which it may be said, as a matter of law, that there is a duty to do something, and in others it may be said, as a matter of law, that there is no such duty. . . . [I]t may be said generally, on the one hand, that if a party negligently creates a dangerous situation it then becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby. On the other hand, it may be said generally, as a matter of law, that a mere bystander who did not create the dangerous situation is not required to become the good Samaritan and prevent injury to others.

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (quoting *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995)); *see also Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942) (same).

Imposing a duty on United Rentals in these circumstances by no means requires the company to play the role of the "good Samaritan," who goes out of his way to aid those to whom he owes no legal duty.[13] Instead, it merely requires United Rentals to avoid "negligently creat[ing] a dangerous situation" that has the highly foreseeable consequence of injuring "others in the exercise of their lawful rights,"

---

[13] *Luke* 10:30–37.

17

such as those driving down the highway, like Davis. When determining whether a negligence duty is owed, the foreseeability of the risk is "the foremost and dominant consideration." *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). Here, the foreseeability of the terrible risk to innocent parties posed by loading unduly tall loads onto trucks bound for an interstate highway ought to be so obvious as to go without saying.

United Rentals frequently has its heavy equipment moved on highways. It had every reason to be well aware of the dangers of oversized loads, and it had ample opportunity to guard against allowing its equipment to be transported dangerously. Most importantly, it would reasonably appear to anyone involved in the loading of equipment like the boom lift that injury, indeed catastrophic injury, is a distinctly foreseeable result of improper loading. We agree with the court of appeals that, in general, "a party who takes affirmative acts that create a danger on a public highway can be held responsible for the results of those actions, along with other responsible actors." 608 S.W.3d at 463. Under these facts, United Rentals owed a duty to Davis and other drivers to refrain from "negligently creat[ing] a dangerous situation" on the highway. *Torrington*, 46 S.W.3d at 837.

United Rentals argues that the trucking company here had "non-delegable" statutory and regulatory duties to comply with load-height requirements, and to ensure proper loading and securing of cargo. *See* Tex. Transp. Code §§ 621.207, .504; *see also* 49 C.F.R. §§ 390.11, 392.9(b)(2); 37 Tex. Admin. Code § 4.11(a). Even assuming the trucking company had such duties, as it likely did, United Rentals

18

cites no authority indicating that the mere existence of a statutory duty enforceable against the trucking company automatically eviscerates all other parties' common law duties that might have arisen depending on the facts. Texas law of course recognizes that more than one defendant can be held liable for a single injury to a plaintiff. The entirety of Chapter 33 of the Civil Practice and Remedies Code, setting out rules of proportionate responsibility, is premised on the principle that more than one party can be legally responsible for a single injury.

The plaintiffs point to an administrative rule requiring that a person "operating or loading" certain vehicles must comply with various requirements, including height restrictions. *See* 43 TEX. ADMIN. CODE § 219.81(a); *see also* TEX. TRANSP. CODE § 621.503. The parties disagree about whether these requirements applied to United Rentals when its employee drove the boom lift onto Martinez's truck, thereby "loading" the vehicle. No matter which side has the correct interpretation of the applicable statutes and regulations, the answer to that question does not determine whether United Rentals owed a common law duty to drivers on Texas roads to avoid negligently creating an extremely dangerous situation.

A tort duty may in some cases be derived from statute or administrative rules rather than the common law. *See Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997) (statute); *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 102 (Tex. 1977) (administrative rule). But United Rentals cites no authority suggesting that a common law claim against one defendant automatically fails because a negligence per se claim against another defendant who violated a statute might also exist.

19

United Rentals may be correct, in a sense, that the trucking company's legal duties regarding safe loading of its trucks are "non-delegable," meaning that the trucking company cannot relieve itself of those duties. But the plaintiffs' claims do not attempt to impose the trucking company's statutory duties on United Rentals. Instead, they seek to hold United Rentals liable, under the common law, for the foreseeable consequences of its own negligence, which contributed to the unsafe loading of the boom lift and thereby to Davis's death. United Rentals does not escape its common law duty to avoid negligent actions that create hazardous road conditions merely because other sources of law impose similar duties on other parties.

**B.**

United Rentals next argues that, assuming it owed the plaintiffs a duty, there was no evidence that it breached that duty, and there was no evidence that its negligence proximately caused the plaintiffs' injuries. We disagree.

The evidence is legally insufficient to support a jury finding when "(1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether there is no evidence to support a jury's finding, all the record evidence must be considered in the light most favorable to the party in whose favor the verdict has been rendered. *Merrell Dow Pharms., Inc. v. Havner*,

20

953 S.W.2d 706, 711 (Tex. 1997).  As we stated in *City of Keller v. Wilson*, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."  168 S.W.3d 802, 827 (Tex. 2005).

We agree with the plaintiffs and the court of appeals that the evidence was legally sufficient to support the jury's findings of breach and proximate cause.  A United Rentals employee loaded an oversized boom lift onto a regular flatbed trailer, even though United Rentals knew a boom lift should not be transported on a regular flatbed trailer and had a policy preventing it.  The error occurred at least partly because United Rentals' employees mishandled the BOL numbers that would have matched the boom lift to the proper trailer.  When United Rentals' employees realized the error, before the accident, they failed to make any effort to fix the problem.  Negligently allowing its oversized heavy equipment to travel down a highway on an unsuitable trailer created an exceptionally dangerous condition and a foreseeable risk of death or serious injury to others, including Davis, whose death was the proximate result of the acts and omissions of United Rentals, among other responsible parties.  Ample evidence supported the jury's findings of breach and proximate cause.

## IV.

Finally, United Rentals argues that the evidence was legally insufficient to support the damages for mental and physical pain and suffering sustained by Davis before his death.  The jury charge asked what sum would fairly and reasonably compensate Davis for his "pain and mental anguish," defined as "the conscious physical pain and

emotional pain, torment, and suffering experienced by Clark Brandon Davis before his death as a result of the occurrence in question." The jury awarded $5 million on this claim. Based on the jury's assignment of 30% responsibility to United Rentals, the court awarded $1.5 million to Pamela Evans as administrator of the decedent's estate.

We agree with United Rentals that the evidence offered in support of these damages was legally insufficient.[14] The alleged damages suffered by Davis included two categories: (1) the mental anguish he suffered in anticipation of his injury as the beams were falling, and (2) the physical pain and attendant mental anguish he suffered after his physical injury but before his death. The jury charge did not separately list the two categories, but the parties agree that these are the two kinds of damages sought for Davis's survival claim.

As to mental anguish preceding Davis's injury, the plaintiffs' accident-reconstruction expert, William Miller, testified that the beam that struck Davis's truck fell to the ground in, at most, nine-tenths of a second. He testified that there was no time for Davis to react by braking or taking other action, but Miller thought "there [was] time to [think] oh, my gosh, what's happening, you know, in a moment." Miller further testified that Davis had "no time to react other than maybe to realize, if he realizes, that [the] beam is falling." But Miller offered no opinion on whether Davis in fact realized the beam was falling before he was killed.

---

[14] United Rentals separately argues that no evidence supports the *amount* of damages awarded by the jury. We need not reach this issue. Nor do we consider United Rentals' suggestion that mental anguish awards for the split-second anticipation of injury should not be permitted at all.

Evidence that there was *time* for Davis to anticipate the injury is not evidence that he actually did so.  There was no evidence that Davis in fact observed the truck hit the overpass or saw the falling debris before it struck his vehicle, and Miller did not purport to have any opinion on whether or not Davis would have actually anticipated the injury under those circumstances.  Thus, while the record may contain evidence that Davis had *time* to perceive the beams falling and anticipate the consequences, no evidence suggests that he actually did.

Testimony that gives "rise to any number of inferences, none more probable than another," is legally insufficient to support the inference of a fact.  *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (internal citations omitted).  Likewise, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred."  *City of Keller*, 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex. 1991)).  "Jurors may not simply speculate that a particular inference arises from the evidence."  *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).  Thus, "[a] jury may not infer" conscious pain and suffering from circumstantial evidence when the evidence gives "rise to any number of inferences, none more probable than another."  *Hammerly Oaks, Inc.*, 958 S.W.2d at 392.  If the jury's inference has no support in the evidence and amounts to nothing more than a guess, the finding cannot survive a legal sufficiency challenge.  *Serv. Corp. Int'l*, 348 S.W.3d at 228–29.

It was the plaintiffs' burden to prove by a preponderance of the evidence that Davis actually suffered the damages claimed.  *Haygood v. De Escabedo*, 356 S.W.3d 390, 399 (Tex. 2011) (quoting *Texarkana Mem'l*

*Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex. 1997)). There was no evidence presented at trial to carry this burden. No testimony from nearby drivers indicated that Davis swerved or otherwise reacted prior to the impact. And the accident-reconstruction expert could not offer an opinion that Davis, more likely than not, perceived the impending impact to his vehicle. As a result, an inference by the jury that Davis did in fact have such a perception would be based not on evidence but on speculation. Any portion of the mental anguish damages awarded by the jury based on Davis's awareness of the impending injury was based solely on speculation and therefore cannot stand.

The remaining question is whether there was evidence that Davis retained consciousness and therefore experienced physical and mental pain after the beam struck his truck. The parties focus on the testimony of the medical examiner, Dr. Townsend-Parchman, who conducted the autopsy. She testified that Davis died from the catastrophic injuries suffered when the massive beam fell on his truck. The horrific extent of the injuries is described by the court of appeals. 608 S.W.3d at 466. Dr. Townsend-Parchman explained that the injuries were caused when "something mammoth crushed" Davis, and the injuries she detailed were "way more than you see in most traffic wrecks." The plaintiffs argue that because Davis's skull was not fractured and the autopsy did not reveal injury to his vertebrae, blood could have continued to travel to his brain for a brief time after the impact.

On the matter of Davis's post-impact consciousness, Dr. Townsend-Parchman was asked: "Can you state, based upon a reasonable medical probability, whether or not Mr. Davis was actually

24

aware of what had happened to him after this accident happened, whether he was consciously aware?" She answered: "He may or may not have been knocked unconscious, and there's no way to know. . . . That's a big question mark that's going to stay a question mark." She agreed that "it would be speculative to say whether or not he was actually consciously aware of what happened to him after this accident." When asked whether he was unconscious, stunned, or "clear as a bell for 10 to 15 seconds" before his brain ran out of oxygen, she stated "[t]here is nothing to distinguish those." Dr. Townsend-Parchman's testimony was the only evidence regarding Davis's post-accident consciousness on which the jury could have relied.

If Davis was immediately rendered unconscious by the impact, then he did not suffer physical or mental pain following the impact. If he retained consciousness, then he likely did suffer such pain. As between these two scenarios, it is the plaintiffs' evidentiary burden to prove by a preponderance of the evidence that Davis actually suffered the claimed injuries—in other words, that he retained consciousness after the impact. Yet the plaintiffs' medical expert, who offered the only testimony on this topic, could not offer an opinion that Davis more likely than not retained consciousness after impact. If there is no evidence one way or another on this question, any damages awarded for conscious pain and suffering could only have been based on speculation, not evidence. Speculation that damages may have been suffered cannot support a judgment. There must instead be some evidence that damages were actually suffered. *D. Houston, Inc.*, 92 S.W.3d at 454.

25

Despite being given multiple opportunities to do so, Dr. Townsend-Parchman declined to testify that, in her opinion, Davis more likely than not retained consciousness. She made it clear that she simply did not know. When considering the possibilities, she testified that "certainly there have been people who in terms of anatomy only had a subscapular hemorrhage [like the one Davis suffered] and were knocked unconscious." On the other hand, "he could have been clear as a bell for 10 to 15 seconds." The jury could not infer from Dr. Townsend-Parchman's noncommittal testimony that Davis was actually conscious after impact. As a result, the evidence supporting damages for post-impact pain and suffering was legally insufficient.

In previous cases, "[t]his Court and [the] courts of appeal[s] have rendered a take nothing judgment on claims in cases for which the evidence is legally insufficient to support the verdict and remanded, where appropriate, for new trial those claims that appear to be supported by legally sufficient evidence." *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 141 (Tex. 2012) (ordering a new trial on negligence claims but rendering judgment on gross-negligence claims because no evidence supported damages for those claims); *see also Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 791 (Tex. 2020) ("Because there is no evidence of damages, we reverse the portions of the judgment awarding damages and render a take-nothing judgment."). Because no evidence supports any of the damages sought for Davis's survival claim, we render judgment for United Rentals on that claim.

26

## V.

For these reasons, we reverse the judgment of the court of appeals on the survival claim brought by Davis's estate, and we render a take nothing judgment on this claim. The case is remanded to the district court for a new trial on the remaining claims.[15]

James D. Blacklock
Justice

**OPINION DELIVERED:** May 12, 2023

---

[15] In addition to the *Batson* issues we have addressed, United Rentals argues, as grounds for a new trial, that the district court erred by allowing the plaintiffs' accident-reconstruction expert to give an erroneous interpretation of the Texas Administrative Code and by refusing United Rentals' requested charge instruction to correct that alleged error. Whether these issues will arise again on remand is unclear, and we do not address them.